# EXHIBIT A

1

<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                   NORTHERN DIVISION AT COVINGTON
                               - - -
 3
     NICHOLAS SANDMANN, by and through his :  Docket No. 19-CV-19
 4   parents and natural guardians,        :
     TED SANDMANN and JULIE SANDMANN,      :  Covington, Kentucky
 5                                          :  Monday, July 1, 2019
                            Plaintiffs,    :  1:00 p.m.
 6          versus                         :
                                           :
 7   WP COMPANY, LLC, d/b/a                :
     THE WASHINGTON POST,                  :
 8                                         :
                            Defendant.     :
 9
                               - - -
10
                     TRANSCRIPT OF ORAL ARGUMENT
11                   BEFORE WILLIAM O. BERTELSMAN
                     UNITED STATES DISTRICT JUDGE
12
                               - - -
13   APPEARANCES:

14   For the Plaintiffs:          TODD V. McMURTRY, ESQ.
                                  KYLE M. WINSLOW, ESQ.
15                                Hemmer, DeFrank, Wessels PLLC
                                  250 Grandview Drive
16                                Suite 500
                                  Ft. Mitchell, KY 41017
17
                                  L. LIN WOOD, ESQ.
18                                NICOLE JENNINGS WADE, ESQ.
                                  JONATHAN D. GRUNBERG, ESQ.
19                                G. TAYLOR WILSON, ESQ.
                                  L. Lin Wood, PC
20                                1180 W. Peachtree Street
                                  Suite 2040
21                                Atlanta, GA 30309

22
     For the Defendant:           KEVIN T. BAINE, ESQ.
23                                KATHERINE M. MEEKS, ESQ.
                                  NICHOLAS G. GAMSE, ESQ.
24                                Williams & Connolly
                                  725 12th Street, N.W.
25                                Washington, DC 20005
</pre>

1                                            WILLIAM G. GEISEN, ESQ.
                                             Stites & Harbison, PLLC
2                                            100 E. RiverCenter Boulevard
                                             Suite 450
3                                            Covington, KY 41011

4
    Court Reporter:                          JOAN LAMPKE AVERDICK, RDR, CRR
5                                            Official Court Reporter
                                             35 W. Fifth Street
6                                            Covington, KY 41011

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by mechanical stenography,
    transcribed by computer.

1     (Proceedings commenced at 1:00 p.m.)

2          THE COURT:  Good afternoon, everybody.  The clerk

3     will call the case, please.

4          DEPUTY CLERK:  Covington Civil 19-19, Nicholas

5     Sandmann versus WP Company, LLC.

6          THE COURT:  All right.  Note your appearances,

7     please.  Start with the plaintiff, I guess.

8          MR. McMURTRY:  Thank you.  Good afternoon, Your

9     Honor.  Todd McMurtry here for the plaintiff, representing

10    Nicholas Sandmann.  I'm joined by Lin Wood --

11         MR. WOOD:  Good afternoon, Your Honor.

12         MR. McMURTRY:  -- Nicole Wade, Jonathan Grunberg,

13    Taylor Wilson, and Kyle Winslow.

14         THE COURT:  All right.  Is that Mr. Sandmann there?

15         MR. McMURTRY:  This is he.

16         THE COURT:  How do you do, sir.

17         THE PLAINTIFF:  Good.

18         MR. WOOD:  His parents are also here, Your Honor.

19         THE COURT:  All right.  You may be seated.

20       For the defense.

21         MR. GEISEN:  Your Honor, good afternoon.  I'm Bill

22    Geisen, counsel for the Washington Post.  I'd like to

23    introduce you to our representatives, as well as the counsel

24    here for the Post.  We have Jay Kennedy, who is the general

25    counsel, and Jim McLaughlin, the deputy general counsel of the

4

1     Post is with us as well.

2              THE COURT:  All right.

3              MR. GEISEN:  And, Your Honor, seated with me at the

4     table is co-counsel, Kevin Baine, who will be presenting oral

5     argument on behalf of the Post, Katie Meeks, and Nick Gamse.

6              THE COURT:  All right.

7         First thing I want to say is everybody relax.  I'm not

8     going to decide these motions today.  They're complex.  I

9     certainly need to write something so nobody will be in doubt

10    on what I have said and why I have said it.

11        I've decided to hold this as a public hearing because of

12    the great public interest in it; and looking around, I see

13    that expectation has been met.  There is great public interest

14    in it.

15        The case is important, not just to the individuals

16    involved, but because of the nature of the issues involved,

17    issues I don't think the public clearly understands when it

18    comes to libel.

19        Years ago -- it's not that many years ago.  I can

20    actually remember this -- there was a time when somebody

21    published something that was false and derogatory of somebody,

22    they were automatically liable.  Liable for libel.

23        That has all changed.  Beginning around 1964, the Supreme

24    Court of the United States introduced further principles into

25    libel law with the intent of protecting freedom of speech and

5

1    freedom of the press.

2        So the media, of course, has become more complex.  The

3    news is produced more instantaneously.  And a lot of times,

4    the first cases involve public officials, and they set a

5    higher standard for a public official to recover.  Then that

6    was expanded to public figures, like football coaches, movie

7    stars, people like that.  And finally, the Supreme Court said

8    that even a private figure, a private individual, cannot

9    recover just because something is false.  He has to show that

10   the defendant was negligent.

11       So with all these factors to consider, I'm certainly not

12   going to sit up here and try to decide this case today.  But I

13   have been over the record several times, and I do want to hear

14   what you have to say about certain things.

15       I have some questions.  No one should speculate from my

16   questions how I'm going to decide this case.  I, myself, don't

17   know how I'm going to decide the case.

18       For those of you who are not familiar with legal

19   procedures, this matter is before the Court not for a trial,

20   but on what's called a motion to dismiss.  A federal case, and

21   a state case too, I guess, is started by the plaintiff filing

22   what's called a complaint.  And that sets forth claims for

23   relief called in some places a cause of action as to why he or

24   she wants to recover of the defendant and what the basis of

25   his claim is.

1   If the defendant feels, as here, that that complaint does

2 not state a valid claim for relief, the defendant can make a

3 motion to dismiss, which the defendant, Washington Post, has

4 done here today.

5   And the discussion or argument -- I've given each side a

6 half an hour.  The arguments will be on whether this complaint

7 has actually stated a valid claim for relief on, I believe,

8 seven newspaper stories that are involved.

9   I'm sure everybody will be discussing these various

10 principles of libel law that have grown up over the past

11 several decades, so I won't go over them in advance.  You'll

12 hear enough of it during the arguments, I'm sure.

13   So that's what we're doing here today.

14   If the motion to dismiss would be granted, the case would

15 be over, and it would go to the Sixth Circuit, I'm sure.  If

16 the motion to dismiss would be denied, the plaintiff would

17 then embark on a period of discovery, where undoubtedly they

18 would take the depositions of all the people that were

19 involved in these incidents and hear from them.

20   So that's where we are today.  We're not at a trial or

21 anything like that.  But it is an important stage of the case,

22 whether the complaint has stated what's sometimes called a

23 cause of action.

24   All right.  So let's get going then.  Let's hear from the

25 defendant on the motion.

1          MR. BAINE:  Good afternoon, Your Honor.  Kevin Baine
2     for the Washington Post.
3          THE COURT:  Welcome to our humble abode.
4          MR. BAINE:  Thank you.  If I may, I'd like to reserve
5     ten minutes.
6          THE COURT:  Yes.
7          MR. BAINE:  Your Honor, this case concerns, you said
8     seven publications, but it's actually four articles, two of
9     which appeared in slightly different versions.
10         Each of these publications must be assessed independently
11    to determine whether a cause of action can be stated against
12    them.  But I would like to begin by saying a word about the
13    overall coverage because I think it places the articles in
14    context.
15         The Post did not create this story.  What it did was to
16    bring to bear old-fashioned reporting to a story that had
17    already gone viral on social media.  And it did that by
18    speaking to participants, by collecting different versions of
19    what happened, by asking the organizers of the trip for
20    comment, and then by following the story to its conclusion.
21         And so the initial stories, which did not name the
22    plaintiff, reported the statement of the Diocese and the
23    school condemning the actions of the students.
24         And the next day, the Post was able to identify the
25    plaintiff and published his version of the events in a

1     front-page story, with the headline "Fuller View Emerges of

2     Conflict on the Mall."

3          And a story four days later reported that the bishop had

4     apologized to the students for his premature statements.

5          And then a couple of weeks later, the Post published

6     another front-page story reporting the results of an

7     investigation where the bishop had exonerated the boys.

8          So a story that started off with official condemnation

9     ended up with official praise, and the Post reported it all

10    start to finish, giving greater prominence to the findings in

11    the students' favor than to the initial story that was

12    critical of them.

13         So there are really four separate publications at issue,

14    and I would like to address each one separately, beginning, if

15    I may, with the first article that actually names the

16    plaintiff and then puts the whole story together.  And that

17    would be Exhibits I and J of the complaint, the sixth and

18    seventh articles that appeared really on day two.

19         The complaint had not --

20         THE COURT:  You're losing me a little bit.  You're

21    starting with the articles that appeared the latest?

22         MR. BAINE:  I'm starting with Exhibits I and J.

23         THE COURT:  Okay.  Well, I might have a different

24    numbering system.

25         MR. BAINE:  Okay.  Those are the exhibits from the

1   complaint.  And, Your Honor, it might be helpful.  I handed up

2   a white binder that has the exhibits to the complaint.

3            THE COURT:  I have my own binder.

4            MR. BAINE:  Okay.  So Exhibits I and J were the

5   article that first named Nicholas Sandmann and that gave the

6   complete account of what happened.

7            THE COURT:  Just so the record may be clear, they're

8   not the first ones that were published?

9            MR. BAINE:  That's correct.

10           THE COURT:  Okay.

11           MR. BAINE:  If you'd like to go in a different order,

12   I'm happy to.  I'm starting with these for a reason.

13           THE COURT:  I've read them all several times.

14           MR. BAINE:  The plaintiff complained of only one

15   sentence in these articles that refers to him in particular.

16   And this is what that sentence says:  "Most of the students

17   moved out of his way, the video showed, but Sandmann stayed

18   still."

19     Now, that sentence could not possibly be actionable.

20   That's exactly what the complaint alleges in paragraph 50(d);

21   that the plaintiff did not move when Mr. Phillips was

22   approached.  So the only sentence that refers to the plaintiff

23   in particular is neither false nor defamatory.

24     In context, this is the full picture that that article

25   presented.  First, that the Hebrew Israelites began the

1    incident by shouting racist and insulting things to the

2    students, things like calling one student by the N word and

3    saying that his friends were going to harvest his organs.

4        Mr. Sandmann's response, as reported in that article, was

5    to, quote, "to remain motionless and calm."

6        Later, the students did respond by doing a school cheer,

7    with permission of their chaperones, to drown out the hateful

8    comments of the Israelites.  That's what the story says.

9        Now, at that point, Mr. Phillips walked up to the group

10   of students, the article says, walked into the group, and came

11   within inches of Sandmann's face.  And Phillips, at that

12   point, clearly could have walked around Mr. Sandmann if he

13   wanted to; but, as he said, he's quoted as saying in the

14   article, "Why should I go around him?"

15       So the article is clear that Mr. Phillips approached

16   Mr. Sandmann and decided not to go around him.

17       Mr. Sandmann, the article reported, was startled and

18   confused and, quote, "did not make any aggressive moves."  He,

19   quote, "stayed still."

20       And then some of the students began doing a tomahawk chop

21   and dancing, which is true and not challenged by the

22   plaintiff.  Indeed, the video that the plaintiff's lawyers

23   produced in this case says the following:  "Many feel the boys

24   crossed the line and were mocking the Native Americans at that

25   point."

 1      Again, there was no hint in the story that Mr. Sandmann

 2  participated in that mocking, although he did.  The story did

 3  not suggest that he did.

 4      THE COURT:  I don't think that's the one they're

 5  complaining about.  They're complaining about the first one

 6  where he says he was swarmed by students and surrounded and

 7  Mr. Sandmann was standing there and blocked his way and left

 8  no room to retreat.  That's the one they're complaining about,

 9  I think.  And that was repeated in several stories.

10      MR. BAINE:  They're complaining about both, Your

11  Honor, but you're correct, that what you just read is the

12  sentence from the first story.

13      THE COURT:  That's from the first story.

14      MR. BAINE:  That they're complaining about.  So let

15  me talk about that sentence.

16      THE COURT:  Okay.

17      MR. BAINE:  This is what it says:  "I, Phillips,

18  started going that way, and the guy in the hat stood in my

19  way, and we were at an impasse.  He just blocked my way and

20  wouldn't allow me to retreat."

21      Now, that's the only sentence in that whole article that

22  refers to the plaintiff that they complain about.

23      THE COURT:  I agree with you.

24      MR. BAINE:  There's a sentence that says that the

25  young man was wearing a relentless smirk, but the plaintiff's

1    complaint does not complain of that because that is true and

2    nondefamatory, or at least a matter of opinion, but they don't

3    complain about that.  They only complain about the one

4    sentence.

5         Now, it's our contention that that sentence is not

6    defamatory, it's not substantially false.  Why do I say it's

7    not defamatory?  Because what it says is that the unnamed

8    student in the hat did not approach Mr. Phillips; that

9    Phillips went toward him.  "I started going that way, Phillips

10   says."

11        The student did not touch Mr. Phillips.  Didn't even

12   intercept him.  He just, according to Mr. Phillips, "stood in

13   my way, blocked my way."

14        In basketball terminology, that would not be a blocking

15   foul by Mr. Sandmann.  If contact had been made, it would have

16   been a charge by Mr. Phillips.  Mr. Phillips approached him.

17   Mr. Sandmann simply stood there.

18        Now, it does say, "wouldn't allow me to retreat."  Now,

19   obviously, the article taken as a whole could not literally

20   mean that Mr. Phillips was literally physically prevented from

21   moving because the article says the stand-off ended, quote,

22   "when Phillips and the other activists walked away."

23        They were perfectly free to walk away.  All Mr. Phillips

24   meant in context was that Mr. Phillips was standing in between

25   him and the Memorial.

1        And by the way, one could not reasonably think that on

2    the broad expansive steps in front of the Lincoln Memorial,

3    that one person standing still was literally physically

4    preventing the other gentleman from moving.

5        Some might think it was stubborn, disrespectful, or even

6    rude --

7        THE COURT:  Let me stop you there and back it up a

8    bit.  I've got it marked here in my notes the paragraph -- and

9    I agree with you, this seems to be the most important

10   paragraph in the case.  "It was getting ugly, and I was

11   thinking that" -- this is Mr. Phillips.  "It was getting ugly,

12   and I was thinking I've got to find myself an exit out of this

13   situation and finish my song at the Lincoln Memorial, Phillips

14   recalled.  I started going that way, and that guy in the hat

15   stood in my way, and we were at an impasse.  He just blocked

16   my way and wouldn't allow me to retreat."

17       Okay.  Now, this turned out to be inaccurate.  You agree

18   with that, don't you?

19       MR. BAINE:  If you were to interpret it to mean that

20   Mr. Phillips was literally prevented from moving in any

21   direction, that would be inaccurate.  But in the context of

22   the article, what I think that means is that Mr. Phillips

23   approached Mr. Sandmann, Mr. Sandmann stood still, blocked his

24   path forward.  And when Mr. Phillips says, wouldn't allow me

25   to retreat, I think what he meant was wouldn't allow me to get

1      up past Mr. Sandmann to the Memorial.

2          But literally, that can't possibly be true.  The steps

3      are hundreds of feet wide.  All he had to do was take a step

4      to the side and walk forward, which he decided not to do.

5          And the article makes clear --

6              THE COURT:  Well, that's the plaintiff's argument why

7      it's libelous.

8              MR. BAINE:  Beg your pardon?

9              THE COURT:  That's the plaintiff's argument why it's

10     libelous.

11             MR. BAINE:  I think that's fair to say.  I think the

12     plaintiffs say it's libelous to say that Mr. Sandmann didn't

13     move, but that's true.  He didn't move.  He stood his ground.

14     And he has said in interviews --

15             THE COURT:  It implies that he wouldn't allow him to

16     retreat.  How could he keep him from retreating unless he was

17     threatening him in some way?

18             MR. BAINE:  Well, literally --

19             THE COURT:  Blocking him physically in some way?

20             MR. BAINE:  Well, there are two issues here, I think.

21     One is whether, as a factual matter, he was literally

22     preventing Mr. Phillips from moving forward.  And second is

23     whether, as the plaintiff suggests, he was actually engaged in

24     an assault of someone.

25         Now, if you read this to mean that he assaulted

1    Mr. Sandmann, Mr. Phillips, that would be defamatory.  But you

2    cannot reasonably, I don't think, read this to mean that

3    Mr. Sandmann was engaged in an assault.  An assault is a

4    violent crime.  It involves the use of force, violence, to

5    inflict injury or, at the very least, to explicitly threaten

6    that I am going to harm you in some way.

7          THE COURT:  Does it imply that he was engaged in a

8    breach of the peace or something like that?

9          MR. BAINE:  I don't think so.  I don't see how one

10   could possibly call standing still and not moving as a breach

11   of the peace.

12      That sentence, those couple of sentences -- maybe it's

13   the one sentence -- describe an impasse in which two people,

14   perhaps stubbornly, are facing each other and neither one

15   decides to step aside and move forward.  They both decide to

16   stand still face to face.  And it's a mutual encounter that's

17   going on because it says, we were at an impasse.

18      I, Phillips, am going his way.  He wouldn't step aside.

19   Impasse.  That's not defamatory.  It might be disrespectful

20   of -- some people might think that it's rude even -- for a

21   teenager not to step aside as an older gentleman approaches

22   him.  But it's not defamatory.

23      And I say that because defamatory, defamation involves

24   the idea of disgrace, as we've quoted in our papers.  Merely

25   to be embarrassing or harmful in some general way is not

1   enough to make it defamatory.  There must be conduct

2   attributed to the plaintiff that would expose him to disgrace,

3   to contempt.  It's a pretty high barrier.  If it's simply

4   embarrassing, unflattering, that's not enough.

5       It might be embarrassing to suggest that this young man

6   didn't step aside when approached by an elderly gentleman, but

7   it doesn't rise to the level of disgrace; to suggest that in

8   the boisterous atmosphere of protests on the steps of the

9   Lincoln Memorial, when approached by a Native American banging

10  a drum, this young man didn't step aside.

11      THE COURT:  Apparently it was enough that people

12  called him with death threats.

13      MR. BAINE:  Well, Your Honor --

14      THE COURT:  It's a difficult case.  I'm one to admit

15  that.  It's a difficult case.

16      MR. BAINE:  One of the points that I'd like to make

17  is the following:  The Post and publishers in general are only

18  responsible for the meanings that they can reasonably be

19  thought to have intended.  And the Restatement says it that

20  way; that the meaning of publications and statements, that a

21  reader could reasonably understand that it was intended to

22  express.

23      So that's important, because what it means is that no

24  publisher is responsible for the judgment and the conclusions

25  that readers might make based upon their own preconceptions.

1      So in this case, it is unfortunately true that a lot of

2 people bring a lot of baggage and a lot of preconceptions to

3 any story about participants in the March for Life march,

4 people who wear Make America Great hats Again, people who are

5 involved in Native American protests.

6      There are people who bring their biases to these stories.

7 And I dare say the one place where you cannot look for

8 evidence of what a reasonable interpretation of a publication

9 is is on the Internet, where people will react based upon

10 their preconceptions, based upon nothing more than maybe

11 seeing a photograph and then, all of a sudden, they will have

12 an image in their mind of what must be going on.

13      The Post is not responsible for those kinds of judgments

14 that people make based upon their own political, cultural,

15 religious, other biases.  They're only responsible for the

16 meanings that they can reasonably be understood to have

17 intended to convey.

18      So did the Post intend to convey that Mr. Sandmann was

19 actually assaulting Mr. Phillips?  It's not conceivably

20 possible to think that the Post was intending to make an

21 accusation of assault against a student simply by saying that

22 he wouldn't step aside.

23      THE COURT:  I think they say in their brief that this

24 was Mr. Phillips' opinion; therefore, it's inactionable.  I

25 see you're running out of time.

1        MR. BAINE:  Yeah, I don't know where the time is.

2        THE COURT:  It's a complex case.

3        MR. BAINE:  There are some statements that are

4   statements of opinion, Your Honor.

5      And another important thing is that there's a video

6   that's attached to all of these articles.  Your Honor has

7   access to some of those.

8        THE COURT:  I've seen some of it.  I'm not sure which

9   ones I've watched.

10       MR. BAINE:  Every online article had a video that

11  accompanied it.  And a reader, if the reader was confused,

12  could go to online video and see students doing the school

13  cheer, which was, by the way, rambunctious and very physically

14  demonstrative.  I would call it almost a warlike battle cry.

15       THE COURT:  That was not from the editors, wasn't it?

16  That wasn't the other group.

17       MR. BAINE:  That was what the students were doing

18  when facing the Hebrew Israelites.  That is on the video.

19       THE COURT:  I know.

20       MR. BAINE:  Also on the videos are the tomahawk chops

21  engaged in by these students.

22     So when Mr. Phillips says things like they're mocking and

23  taunting me or when the Post writes that they were mocking and

24  taunting, videos show, people can go look at those videos and

25  decide, well, do I agree that that shows mocking and taunting

1    or do I disagree.

2         So some of the statements are statements of opinion; and

3    oftentimes, it's clear that they're statements of opinion

4    based upon an image.

5         There's one column, for example, that says an image

6    appears to show that the young man was intimidating

7    Mr. Phillips.  Well, that article had the video on top of it

8    and the sentence that says "appears to intimidate

9    Mr. Phillips."  The words "Nathan Phillips" are a link to

10   another story, which also had the whole video there.

11        So people can look at the video and decide, well, do I

12   agree or disagree that he appears to be physically

13   intimidating.

14        And physically intimidating, even that is not defamatory.

15   Physically intimidating, if that means you're standing still

16   on a step above looking down at somebody and not moving, some

17   people might think that appears to amount to physical

18   intimidation, but it's not disgraceful conduct in the context

19   of a loud and boisterous protest on the mall.

20        This is not taking place in a church or a cathedral.

21   It's taking place in which there are three groups kind of

22   yelling at each other at various times.  And Mr. Sandmann is

23   described as being motionless and calm in response to the

24   outrageous taunts by the Hebrew Israelites.  Then he

25   acknowledged that he participates in a tomahawk chop.  I don't

20

1  think it's defamatory or false to say that either of those

2  things occurred.

3      What is it that the Post has said about Mr. Sandmann in

4  particular?  It said only one thing, that he didn't move when

5  Mr. Phillips approached.

6      Most of the other statements in these articles are about

7  the students in general.  The second major article says there

8  were about a hundred students there.  When it says some of the

9  students said X, well, that doesn't mean Mr. Sandmann.

10      THE COURT:  Do we need to look at each article and

11  judge it on its merits, or do we need to read the first

12  article and alongside it have, let's say, amended by the

13  subsequent article?

14      MR. BAINE:  I think that the law views each article

15  as a separate publication.

16      THE COURT:  Well, that's what I'm looking at, the

17  first one.  And it says he just blocked me way and wouldn't

18  allow me to retreat.

19      MR. BAINE:  And also our contention --

20      THE COURT:  We've been talking about that.  A lot of

21  things I want to nail down here.

22      MR. BAINE:  Sure.

23      THE COURT:  Do you admit that Mr. Sandmann is a

24  private figure?  You don't contend that he's a public figure?

25      MR. BAINE:  We haven't argued he's a public figure

21

1   because it's not relevant to this motion.  We might argue that

2   later on.

3            THE COURT:  Well, at least not now, you're not

4   arguing?

5            MR. BAINE:  It's not part of the motion, Your Honor.

6            THE COURT:  Okay.  That was the main thing I wanted

7   to nail down.

8            MR. BAINE:  But the fact that Mr. Sandmann is a

9   teenage high school student with a bunch of high school

10  students I think also has a bearing on how a reasonable

11  reader, not someone who's got a bias or a prejudice who reads

12  the Internet and posts comments, but a reasonable reader

13  would, I think, take into account the fact that these are

14  young high school students on a trip to Washington and a March

15  for Life and on the steps of the Lincoln Memorial; and even if

16  you thought that the article suggested that Mr. Sandmann did

17  all the things that are only attributed to students in

18  general, even if you thought that, that that wouldn't be

19  enough to rise to the level of disgraceful conduct by a group

20  of teenage boys confronted with the kind of boisterous

21  situation on the mall so they react boisterously, as young men

22  can do.  It's not disgraceful for them to have done that.

23       On the other hand, I think it's fair to say that in

24  retrospect, probably everybody can second-guess their conduct

25  in the course of this case, starting with the black Hebrew

1    Israelites right on through the Native Americans right on

2    through the chaperones and the students, everybody who covered

3    this situation.  We can all go back and ask, how could we have

4    done this more perfectly.  That's not the issue on this

5    motion.

6         The issue on the motion is strictly this:  Did the

7    Washington Post say something about this plaintiff in

8    particular that exposed him to publication and contempt in the

9    eyes of a reasonable reader of these articles, not someone

10   who's been influenced by the social media commentary that

11   preceded the articles, not even by people who might have seen

12   the Post article, as well as many other articles.  But take

13   the reasonable, objective person, not a real human being, but

14   a reasonable man, reasonable woman, who just looks at the Post

15   articles and the Post videos and asks, did they say something,

16   did they attribute disgraceful or contemptible conduct to

17   Mr. Sandmann.  And I would maintain that they don't.

18        THE COURT:  Do you throw out the argument that this

19   statement doesn't refer to Mr. Sandmann?

20        MR. BAINE:  Oh, not at all, Your Honor.  The article

21   refers to him in two sentences.  In one sentence --

22        THE COURT:  Well, the guy in the hat.  The Kentucky

23   test is would his friends and acquaintances know who was

24   meant.

25        MR. BAINE:  That refers to him.

23

1          THE COURT:  And I would think that that would

2    probably be met because a lot of his friends and acquaintances

3    were there.

4          MR. BAINE:  I agree with Your Honor.  That is the one

5    sentence in that article that refers to him in particular.

6    We're not arguing that no one would know who he is.  A lot of

7    people wouldn't, but some people would.

8       I dare say this --

9          THE COURT:  That's the Kentucky test.

10         MR. BAINE:  I dare say this.  Anybody who would know

11   that's Mr. Sandmann would probably have the curiosity to click

12   on the video and find out what really happened by watching it

13   themselves.

14      And so the reality is, although this is not part of this

15   motion, the reality is, I dare think anybody who knows

16   Mr. Sandmann probably does not have a lower estimation of him

17   after reading the article.

18         THE COURT:  Then you have another argument that it's

19   not libel per se; it's libel per quod, which would require him

20   to make allegations of special damages.

21      Do you want to persist in that?

22         MR. BAINE:  Yes, Your Honor.  There's an issue about

23   whether the Supreme Court has taken back what it said in

24   *Sweeney*.

25      In *Sweeney*, the Court of Appeals, then the highest court

1    in the state, said this:  "Statements," quote, "reasonably

2    susceptible of a defamatory meaning as well as an innocent

3    one, that may be defamatory by reason of their imputation or

4    by reason of certain extrinsic facts, require evidence of

5    pecuniary loss arising from the use thereof."

6        That is not the law everywhere, but it is the law of

7    Kentucky.  It was applied by, again, the Court of Appeals,

8    then the highest court in the state, in *Towles v. Travelers*

9    *Insurance Company*, where the Court said that one might draw a

10   defamatory inference from the language used.  That's their

11   quote.  But that because that was only one possible

12   interpretation, it wasn't defamatory per se.  There had to be

13   special damages.

14       Now, the plaintiff argues that the Supreme Court

15   overruled that principle in *Stringer*.  We say it did not

16   because *Stringer* did not involve an ambiguous statement at

17   all.  *Stringer* didn't talk about how to derive a meaning from

18   an ambiguous statement.  It didn't talk about libel

19   implication.  It didn't mention *Sweeney* or *Towles*.

20       The statement in *Stringer* was an explicit accusation of

21   theft.  It was not a matter of where the statement could be

22   read meaning one thing or the other.  So that decision in

23   *Stringer* can't possibly take anything away from the statements

24   in *Sweeney* and *Towles*, which remain good law in Kentucky, that

25   if a statement is susceptible to more than one meaning and

1   it's only defamatory by reason of the inference or the

2   interpretation you put on it, there have to be special

3   damages.

4       That makes a lot of sense if you think about it.  If a

5   statement is only defamatory if you take it in a certain way,

6   that means that you shouldn't presume that there were damages.

7   There should be proof of damages.

8       There is no obligation of special damages in this case,

9   nor I suspect will there ever be any amended complaint

10  alleging special damages.

11      So what we have is a case in which, in some cases, the

12  plaintiff says, oh, what was said means this.  They say it

13  means assault.  We say it doesn't mean assault.  I don't think

14  it can be reasonably understood to mean that.  But even if you

15  thought that it could reasonably be meant to understood to

16  mean that Mr. Sandmann assaulted Mr. Phillips, that is the

17  defamation per quod, only actionable if there are special

18  damages.

19      I suspect my 20 minutes are up.

20          THE COURT:  It is.  We'll give you ten minutes

21  anyway.

22          MR. BAINE:  Thank you, Your Honor.

23          MR. McMURTRY:  Good afternoon, Your Honor.

24          THE COURT:  Good afternoon.

25          MR. McMURTRY:  Todd McMurtry.  I'm here to argue on

1    behalf of Nicholas Sandmann.

2        Counsel.

3        And thank you for the opportunity to be heard.

4        As you know, I represent Nicholas Sandmann.  And, Your

5    Honor, as you know, Nicholas Sandmann has been subjected to a

6    world of attention through what happened on the Washington

7    Mall.

8        But what we'd like to emphasize to the Court at the

9    outset is that this lawsuit is not a political lawsuit.  It is

10   not a lawsuit to discourage speech directed at President

11   Trump.  The lawsuit seeks only to redress the Washington

12   Post's false, defamatory, and negligent reporting.  Really, an

13   unprecedented injustice done to a young man, Nicholas

14   Sandmann, who is with us here today.

15       The Post's reporting, in part, permanently scarred the

16   reputation of Mr. Sandmann, who did little more than stand

17   completely still when confronted by an adult stranger beating

18   a drum inches from his head.

19       Mr. Baine and you discussed the issue of what a

20   reasonable reader might interpret when reading the articles

21   published about Mr. Sandmann by the Washington Post.  And what

22   I'd like to let the Court know is that on these articles that

23   are published online, there are literally thousands of

24   comments on the article that are available on the online

25   version of the articles linked to the video.  And those online

1    statements say terrible things like, "If there was ever a

2    punchable face, it's that Nicholas Sandmann."

3              THE COURT:  That's the comment of some reader.

4              MR. McMURTRY:  Yes, the average reader, 8,000 of

5    them.

6              THE COURT:  And I believe the Indecency Act, that I

7    had a case it was reversed on, permits people to post without

8    the persons running the site being libel.

9              MR. McMURTRY:  Well, it does.  Certainly then

10   Communications Decency Act does do that, and I'm not saying

11   that the Post should be liable for that.  I'm only saying what

12   an average reader who read the article took from the article,

13   and they published their feelings on that.  So I think that

14   that's important for the discussion.

15             THE COURT:  And do you agree with me that the most --

16   everything seems to turn, or almost everything, on the

17   statement that Mr. Phillips made, "I started going that way,

18   and that guy in the hat stood in my way, and we were at an

19   impasse.  He just blocked my way and wouldn't allow me to

20   retreat"?

21             MR. McMURTRY:  Certainly that's an important

22   statement.  I think the Court has to look at the gist of the

23   entire article.  And the gist of the entire article paints a

24   very unflattering picture of Mr. Sandmann.  It characterizes

25   him as a white person, a male, Catholic, pro life, wearing a

1   Make America Great Again hat, who, in essence, engaged in an

2   assault of a peaceful Native American who was drumming his

3   beat and singing a song of praise.  And that's what the gist

4   and the article, how it described it.

5            THE COURT:  But is it an assault?

6            MR. McMURTRY:  How is it an assault?

7            THE COURT:  Is it an assault?  If he says he wouldn't

8   allow me to retreat, it's kind of vague.  If he grabbed ahold

9   of him and wouldn't allow him to retreat, that would be an

10  assault.  If, indeed, that's what it says.

11           MR. McMURTRY:  Yes, Your Honor.

12      If you look at the article as a whole, it does suggest

13  that -- and the Post's own reporting on this, which I can

14  describe to you, says that a reader could reasonably take,

15  from reading these articles, that Nicholas Sandmann

16  identified, approached, confronted, surrounded, swarmed

17  Mr. Phillips.  And when you take the entirety of the article

18  and the gist of the entire article, yes, it does allege an

19  assault.

20      And I think that really takes us past the whole issue of

21  the defamation per se versus per quod argument because it does

22  assert what a reasonable reader could conclude was an assault

23  upon Mr. Phillips.

24      And, of course, it goes on further to call him, in

25  essence, without using the word, a racist, and attaching

1    racist conduct to what he said.

2        In response to one thing that Mr. Baine said that I do

3    want to take issue with on the racism issue, is that we do not

4    agree that Nicholas Sandmann engaged in the tomahawk chop.

5        I don't want to characterize the tomahawk chop, but we do

6    not agree that that happened.  And that would be his testimony

7    if he were asked, that he did not engage in the tomahawk chop

8    on the Mall.

9        What I think is important to look at is what the

10   Washington Post said in its article and what it later said

11   through its editor's notes and some of the comments of its

12   reporters.

13       The Post has admitted through an editor's note that its

14   coverage was false.  It confessed on March 1 that the gist

15   conveyed in the reporting did not occur.

16       For example, the Washington Post reported the false gist

17   that -- and that is a quote from their editor's note --

18   "Phillips started going that way, and that guy in the hat

19   stood in my way, and we were at an impasse.  He just blocked

20   my way and wouldn't allow me to retreat.  The teen, shown

21   smirking at him in the video, was blocking Phillips from

22   moving."

23       And that was mentioned in the first, third, and fourth

24   articles that we described in our complaint.

25       The editors, unlike the attorneys, but the editors, in

1   their note, say, "A more complete assessment of what occurred

2   either contradicted or failed to confirm Phillips' account

3   that he was prevented by one student from moving on."

4        So that's what the editors back in Washington are saying.

5             THE COURT:  How many days after the initial story did

6   that occur?

7             MR. McMURTRY:  I think it was March 1, Your Honor.

8             THE COURT:  Okay.  Three or four days?

9             MR. McMURTRY:  No, I'm sorry.  Excuse me.  Yes, I

10  have March 1 editor's note.  No, the events occurred at end of

11  January, so this would have been more than a month after the

12  events.

13            THE COURT:  Okay.

14            MR. McMURTRY:  So they go on.  There are a couple of

15  these that are important for the Court to understand.

16       Again, the Washington Post reported a false gist when it

17  said in its fifth article, "One of the members of the group

18  appeared to physically intimidate Nathan Phillips," but the

19  editor's note admits that no such physical intimidation

20  occurred."  It says, "A more complete video does not show that

21  the student physically intimidated Phillips."

22       And I think a good side note on the idea of a more

23  complete video is that when Mr. Baine references a video that

24  was mentioned in the articles, that is the unsourced viral

25  video that circulated on Twitter and other social media

1    platforms.  And, in fact, the Post based its initial reporting

2    on this unsourced viral video, which it, we hope to prove

3    eventually, knew was not credible.  So that is another

4    important point on this.

5        Again, turning to the editor's note, the Washington Post

6    reported the false gist that, quote, "A viral video of a group

7    of Kentucky teens in Make America Great Again hats taunting a

8    Native American veteran on Friday."

9        But the editor's note on March 1 admits that no taunting

10   occurred.  It says, "A more complete assessment of what

11   occurred either contradicted or failed to confirm that

12   Phillips' group had been taunted by the students in the

13   lead-up to the encounter."

14       Again, the Washington Post further reported a false gist

15   when they wrote, when they initially reported, "A few people

16   in the March for Life crowd began to chant, 'Build that wall.

17   Build that wall.'"  And I think that was a quote from

18   Phillips.  But the editor's note admits that neither Nicholas

19   or any of the other students said that phrase.  Okay.  It

20   says, "Students chanting 'Build that wall.  Build that wall,'

21   was not audible on the video."

22       Another point that the Washington Post reported on that

23   is a false gist is that, "Nicholas and the teens suddenly

24   swarmed around Phillips and it was an aggressive display of

25   physicality.  The students were rambunctious and trying to

1   instigate a conflict."

2       But the editor's note admits that Nicholas did not

3   instigate a conflict.  The editor's note says, quote, "A more

4   complete assessment of what occurred either contradicted or

5   failed to confirm that the students were trying to instigate a

6   conflict," close quote.

7       Furthermore, the Washington Post has stated on its

8   website as to what the purpose of an editor's note is.  And I

9   think this is very important.  This is in the Washington

10  Post's own words on their own website.  An editor's note is a

11  correction that calls into question the entire substance of an

12  article, okay (1) raises a significant ethical matter (2) or

13  addresses whether an article did not meet our standards.  In

14  those circumstances, it may require an editor's note and be

15  followed by an explanation of what is at issue.

16      So what I described to you was the Post completely

17  retreating from its initial coverage and admitting that it was

18  wrong in nearly every significant circumstance.  Okay.

19      Now, the Washington Post has confessed and admitted that

20  the following things did not occur.

21      Again, Native American Elder Nathan Phillips was not

22  prevented from moving on.  In other words, Phillips was not

23  blocked by Nicholas in any way, shape, or form.

24      Two, that the Indigenous People Group had not been

25  taunted by the students in the lead-up to the encounter.

1          THE COURT:  Well, you put it in the complaint

2     yourself that when he appeared on television the next day, he

3     said that he blocked the Native American.

4          MR. McMURTRY:  I don't think our complaint says that

5     Nicholas Sandmann blocked the individual.

6          THE COURT:  No, you refer, in your complaint, I think

7     at paragraph 40, you refer to this television interview he

8     gave in a couple of days.

9          MR. McMURTRY:  Yes.

10         THE COURT:  And in that one, didn't he admit that he

11    blocked Phillips?

12         MR. McMURTRY:  No.  I think he was asked, the

13    question whether or not -- you know, why would you stand your

14    ground, so to speak.

15         THE COURT:  Okay.

16         MR. McMURTRY:  And he said, you know, I'm entitled to

17    stand where I was.

18         THE COURT:  Maybe that's blocking somebody.  You

19    can't go through him.

20         MR. McMURTRY:  Well, I know.

21         THE COURT:  Standing in front of somebody in a narrow

22    entryway and he doesn't move and the other person wants to go

23    through, then he's blocking him.

24         MR. McMURTRY:  Well, but if you read the article in

25    its entirety, the Post admits and reported itself, it suggests

34

1    this idea of identifying, confronting, blocking, swarming, and

2    surrounding, which is, you know, the suggestion of a crime

3    when you look at it in total.

4        So I don't think that we can put a microscope to every

5    sentence and say that, you know, that that's what it says.  We

6    have to look at the article in its entirety and get the gist

7    of what's been said.

8            THE COURT:  Just out of curiosity, did he go to

9    New York for that interview, or did they do it remotely?

10           MR. McMURTRY:  No, they did it here.  That occurred

11   out by the airport.

12       So the Post -- I said what the Post has admitted through

13   its editor's notes is that they did not physically intimidate

14   Phillips, that Nicholas and the students were not trying to

15   instigate a conflict, and that Nicholas and the students did

16   not chant "Build a wall" toward Phillips or any of his

17   Indigenous People Group.

18       Now, continuing this thread, I wish to call to the

19   Court's attention things that were written by the Washington

20   Post reporter Megan McArdle -- and these are cited in our

21   brief -- in response to the Washington Post's Lincoln Memorial

22   coverage.

23       She said, quote, "Then a longer video surfaces proving

24   pretty incontrovertibly that almost none of what the Post

25   reported happened."  And that's significant.  That's from one

1    of their own reporters.

2         THE COURT:  What exhibit is that in?

3         MR. McMURTRY:  It's a footnote of Ms. McArdle's

4    quotes.  Oh, Ms. McArdle's commenting on the entirety of the

5    Post's reporting on this, and we cited it in one of our

6    footnotes, I think in our memorandum in opposition.

7         THE COURT:  Okay.  I'll look at it.

8         MR. McMURTRY:  And she went on to say, "This is

9    obviously not even close to what Phillips said happened and

10   also very hard to confuse Phillips' account.  The

11   discrepancies are not minor."

12       She goes on to say, quote, "Any piece of information that

13   comes from Phillips should be utterly discounted."

14       And she said further, "Fighting racism is a good cause.

15   It's a great cause.  But it does not require us to believe

16   that things are not true, and it cannot afford for us to

17   believe things that aren't true."

18       So in essence, she's admitting as well that the Post

19   reporting got it entirely wrong.

20       So there's really, they have admitted their fault,

21   admitted that what they've reported was false, and admitted

22   that the manner of their reporting, they got it wrong.

23       Another interesting point as to what the Washington Post

24   has said about its own reporting.  Erik Wemple, who is another

25   Washington Post reporter, authored an article entitled,

1    "Fuller Picture:  How Major Media Outlets Handled Their

2    Evolving Accounts of the Covington Story."  And he stated in

3    part, quote, "Given Phillips' comment to the Post that he was

4    swarmed by the students, readers would be likely to conclude

5    that the students saw him from afar, targeted him in advance.

6    We learned later that Phillips himself had walked straight

7    into the student group, making a swarm all but inevitable.

8    Let's say a man jumps from a platform into an aquatic expanse.

9    Did he dive into the water, or did the water surround him?"

10       And I think that is a strong indictment of how the Post

11   characterized the story and its reporting and what the gist of

12   the entire article was.

13       And so readers would be licensed to conclude that the

14   article, at the very least, imputed the crime of assault

15   toward Nicholas and the sole motivation was based upon an

16   intense hatred of Native Americans and African Americans.

17       The Post's legal contentions are wholly disingenuous.

18   For example, if the Post has admitted that the gist conveyed

19   by its reporting was false, then why do its lawyers contend

20   that some of the statements were substantially true?

21       Why, then, did the Post lawyers contend that some of the

22   statements are protected opinion when it admits that the

23   opinions had a sufficient and factual connotation to be deemed

24   provably false?

25            THE COURT:  Okay.  Let's stop there.  I was going to

1    ask you about that in a minute.  Now, here's the key

2    statement.  "He just blocked my way and wouldn't allow me to

3    retreat."  Let me read the whole sentence again.  "I started

4    going that way, and that guy in the hat stood in my way, and

5    we were at an impasse.  He just blocked my way and wouldn't

6    allow me to retreat."

7        Now, is that a statement of fact, or is that a statement

8    of his opinion, Mr. Phillips' opinion?

9            MR. McMURTRY:  Well --

10           THE COURT:  The way this goes, as I understand it, he

11   made the statement, he repeated it to your reporter, to the

12   Post reporter rather, and they published it.  And since we

13   don't have in Kentucky the Neutral Reportage Act, they are

14   responsible as if they had said it.

15           MR. McMURTRY:  Right.  I think it --

16           THE COURT:  That might be an overstatement.  But

17   anyway, if it's opinion, it's not recoverable.  It's not

18   considered to be libel.

19           MR. McMURTRY:  First off, we think it's a fact.  We

20   think it's a factual statement that describes an event of

21   things that Phillips claims actually occurred.

22       And the Post is negligent for republishing those

23   statements, which have now been proven to be false and

24   admittedly false by the Post's own reporters.

25       And I think, Your Honor, we don't agree that it's an

1   opinion; but if you were to, in your mind, conclude it's an

2   opinion, I think you'd have to go to the reasons that you had

3   in your case *Loftus v. Nazari* when you talked about, you know,

4   opinions that were protected opinions or not.

5       In the *Loftus* case, Ms. Nazari presented all of these

6   facts, and you said the reader was left to conclude from the

7   facts whether it was true or false.

8           THE COURT:  Well, she was a patient of a doctor.

9           MR. McMURTRY:  Right.

10          THE COURT:  She said the doctor didn't do a good job

11  on her plastic reconstructive surgery.  So the last part that

12  was the opinion that the doctor didn't do a good job, the

13  doctor said she did this great job as medical science would

14  permit.

15          MR. McMURTRY:  But I think what's important is that

16  the underlying -- the facts, I think in your opinion, you

17  stated those facts are, in essence, admitted or agreed to.

18      In this circumstance, we believe that there are events

19  described that either happened or did not happen that are

20  either true or false, and even if the Court were to conclude,

21  which is an opinion which we do not agree with, the

22  connotation of the opinion is created from facts which are

23  either provably true or provably false.

24      And we allege in our complaint that they're false.  And

25  at this stage of a motion to dismiss, we think that it is not

1    appropriate.  And, you know, in actuality, it should be an

2    issue ultimately decided by a jury.

3           THE COURT:  Do you not agree that Phillips was being

4    sincere when he was of the opinion that he was being blocked

5    and not allowed to retreat, but Mr. Sandmann was of the

6    opinion that he was just standing there and Phillips could go

7    wherever he wanted?

8           MR. McMURTRY:  Well, I think that the underlying fact

9    is that what Phillips says is not true.  And so therefore,

10    it's --

11           THE COURT:  But isn't that opinion?

12           MR. McMURTRY:  I do not think it's an opinion at all.

13    "He just blocked my way and wouldn't allow me to

14    retreat."  I don't know how that can be an opinion.  If

15    somebody blocks your way, that's a fact that's provable true

16    or false.

17           THE COURT:  This video I did watch -- apparently

18    there are way more videos than I watched, but I did watch a

19    couple of them.  And it does show Mr. Sandmann standing there,

20    Phillips standing in front of him, facing him, beating his

21    drum, and it kind of stops there.  Then there's other stuff.

22    I don't think that was on the video that I was watching.

23           MR. McMURTRY:  Well --

24           THE COURT:  It's conceivable that Phillips thought

25    Sandmann was blocking him, but Sandmann thought if he wants to

1   go around me, go this way or say excuse me, please and I'd get

2   out of his way.

3          MR. McMURTRY:  Well, you know, in *Milkovich*, they

4   talk about he's a liar versus, you know, he's a Communist who

5   follows the teachings of Marx and Lenin.  It's kind of the two

6   comparisons going from opinion.

7      This is much closer to saying he's a liar, which the

8   Court in *Milkovich* found was defamatory of the wrestling

9   coach, when the reporter claimed that the wrestling coach had

10  lied on the stand with regard to the hearing upon the dispute

11  in *Milkovich*.

12     So our fact pattern is much more similar to an exact --

13  nearly exactly like the fact pattern in *Milkovich* where the

14  Court found that the opinion -- that it was not a protected

15  opinion and that the opinion was actionable by the plaintiff,

16  ultimately found in favor of the plaintiff.

17     And one other point is that our complaint alleges

18  negligent republication.  Okay.  So we expect to be able to

19  prove and have pled adequately that what was stated was false.

20  And we also claim -- and we didn't hear any of this from

21  Mr. Baine -- that the Post negligently republished these

22  defamatory statements and, therefore, it should be held libel

23  for those defamatory statements.

24     So I think either way you look at it, whether you analyze

25  it from the *Milkovich* standard or simply from the negligent

1    republication, that we should be successful in avoiding this

2    motion to dismiss and granted the opportunity to go forward

3    and conduct discovery and find out more fully what the Post

4    reporters thought, to talk to Mr. Phillips and question him.

5          And I guess a final point on this opinion issue, Your

6    Honor, as to whether or not it can be proven true or false.

7    We put out a video that says The Truth in 15 Minutes.  The

8    black Hebrew Israelites also put out a video that's an hour

9    long that shows everything that happened.

10              THE COURT:  I think that's the one I saw.

11              MR. McMURTRY:  Okay.  Either video -- our video shows

12   it plain as day.  But in essence, what happens here is that --

13              THE COURT:  Where did you get your video?  Who took

14   that video; do you know?

15              MR. McMURTRY:  Well, we got our video from a variety

16   of sources that we found on the Internet and edited them

17   together to show a full picture of what happened.

18         And when you look at the full picture of what happened

19   with Mr. Sandmann, Nicholas here -- I guess you'd say Master

20   Sandmann.  But when you look at what happened to him, he is,

21   in essence, you know, looking to his right, kind of laughing

22   as Phillips bounces around with the drum.  And then Phillips

23   just leaps right up on him, and Sandmann is caught unaware and

24   off guard.

25         So I think that means, that factual statement means that

1    this opinion, the connotations of the opinion, can be proven

2    true or false.  Either the event happened or it did not.

3        And given an opportunity to fully explore the video, we

4    think Your Honor will conclude at the motion for summary

5    judgment stage that it didn't happen and it's not a protected

6    opinion.  So that's our position on this.

7        Going back to the issue of the liability or negligently

8    republishing defamatory statements of others, although this

9    comes at the end of my argument, it is very important to

10   everything that we're saying here, because the Post went out

11   and republished multiple defamatory statements from other

12   people.  And as we say, and as Kentucky law says from as late

13   as the later 1800s, tale bearers are as bad as tale makers.

14       The Post cannot simply pin quotes to something and argue

15   that they are free from liability because someone else said

16   the defamatory statement.  And that's, in essence, what

17   Mr. Baine was saying; we report things as they evolve.

18       In my view, the idea of reporting things as they evolve

19   is well past the determination of whether something is true or

20   false and well past the determination of whether something is

21   capable of a defamatory meaning, well past publication, and

22   down to the issue of negligence, which is not at issue today.

23       So Mr. Baine is, in essence, arguing that the reporting

24   is not a negligence.  So that is not a basis for dismissal.

25   So their statements and their republication of defamatory

1  comments, you know, is also very important to the Court's

2  consideration.

3      And as you said, Your Honor, there is no protection in

4  Kentucky from neutral reportage.  The Kentucky Supreme Court

5  has clearly rejected that in *McCall v. Courier-Journal*.

6  Therefore, the Post has no constitutional privilege shielding

7  it from liability.

8      THE COURT:  But if they can show they thought it was

9  a reliable source, then they wouldn't be negligent, would

10  they?

11      MR. McMURTRY:  No, I don't think that that's correct.

12  I don't think the reliable source would apply to --

13      THE COURT:  Although he's not a public figure, you

14  still have to show they were negligent.

15      MR. McMURTRY:  Right.  But that doesn't come today at

16  the motion to dismiss.

17      THE COURT:  No.

18      MR. McMURTRY:  With regard to saying are the people

19  who said the terrible things and, you know, the Congressmen

20  and the Diocese and people that said terrible things about

21  Nicholas Sandmann in these articles, are they reliable

22  sources, I'm not aware of any law that would protect them.

23      THE COURT:  What kind of articles are we talking

24  about?

25      MR. McMURTRY:  I'm sorry?

1          THE COURT:  Remember they have a website and they

2     allow people to post on the website.

3          MR. McMURTRY:  No, I'm not --

4          THE COURT:  According to that statute, the owner of

5     the website is not liable.

6          MR. McMURTRY:  I agree.  At no point do I mean to

7     suggest -- I'm familiar with the Communications Decency Act.

8     I'm not saying --

9          THE COURT:  Neither am I.

10          MR. McMURTRY:  I'm talking about republishing a

11     statement from the Diocese of Covington.  I'm talking about

12     republishing statements from elected officials, Deb Haaland,

13     Elizabeth Warren, you know, that say some pretty rough things.

14     Chase Iron Eyes --

15          THE COURT:  I guess my question is, did they just

16     allow them to be on the website, or did they republish them in

17     the newspaper?

18          MR. McMURTRY:  They're in the articles.  What Chase

19     Iron Eyes said, which is completely false, is in the article.

20     And I don't know the name of the other person.  I could find

21     it.  There are two people who were present on the Mall who

22     make false statements about what occurred that lend themselves

23     to the defamatory gist overall.

24          So we believe that the Post has republished those false

25     and defamatory statements from Nathan Phillips, from Chase

1     Iron Eyes, and there's one other person there at the

2     Indigenous Peoples March that also made false and defamatory

3     statements toward Nicholas Sandmann and are mentioned in the

4     Post article, not in online comments.

5         I only raised the issue of the online comments to show

6     what an average lay reader might believe.

7         I don't know what my time is at this point.

8             THE COURT:  I have one more question.

9             MR. McMURTRY:  Sure.

10          THE COURT:  You have claims in large amounts for

11    punitive damages.  Kentucky law is pretty strict on punitive

12    damages.  It says you would have to prove oppression, fraud,

13    or malice.

14        What would your evidence be that there was any

15    oppression, fraud, or malice?  I would interpret that meaning

16    being exculpatory about the move.  That would not be

17    oppression, fraud, or malice.

18          MR. McMURTRY:  Well, that's easy to answer.  I think

19    that the issues that raise to the level of oppression, fraud,

20    or malice that would give the basis for punitive damages,

21    there are a couple.

22        First, the video that the Post reported on was taken off

23    of the Internet.  It was an unsourced video.  Nobody knew

24    where it came from.  It was edited; and it was, in essence,

25    weaponized to spread all across the country.

1    The Washington Post took a video that it knows itself was

2    unreliable and then used that as a basis for reporting on this

3    story.  And they actually linked their story to it.  And so I

4    think that using that video is completely malicious in that it

5    also advances the political agenda of the Post that we talk

6    about in our complaint and its anti-President Trump agenda.

7    And as I said, we're not here to take a political

8    position or to defend the president one way or the other.

9    We're the victims, and we will contend that our client was

10    merely a tool in the Post's aggressive reporting against the

11    president of the United States.  So that's one issue.

12    The second issue is on the Post's own website, they have

13    a guide to fake videos.  And it talks about different

14    criteria.  Is it edited?  You know, how long it is?  Is it

15    taken out of context?

16    The Nick Sandmann video should be the video that they use

17    on their website to show what a fake video is because it

18    really is fake when compared to what other videos taken as a

19    whole ultimately show.  And so that's the second thing.  We

20    think when we present that evidence to the Court, the Court

21    will be able to conclude that the Post violated its own

22    policies to chase this story.

23    And I think the third point, which is important to

24    determine why we think we can pursue punitive damages in this

25    case, is that this was not hot news.  This was not a crisis in

1    the Persian Gulf.  This was not President Trump crossing the

2    border into North Korea.  This was nothing that the public

3    needed to know about today.  It's something that the Post

4    wanted to report on right away so that they could get all of

5    their readers excited about what was going on, which is noted

6    by the 8,000 comments the article created.

7        So we think that the Post knew what it was doing, knew

8    the risks it was taking, and did so maliciously, in a grossly

9    negligent manner, understanding the potential consequences but

10   throwing caution to the wind.  So that would be my answer to

11   that question, Your Honor.

12            THE COURT:  Okay, sir.

13            MR. McMURTRY:  Thank you very much.

14            THE COURT:  Good presentation.

15       The defendant has ten minutes left.

16            MR. BAINE:  Thank you, Your Honor.  On the question

17   of opinion pertaining to the critical statement, "I started

18   going that way and the guy in the hat stood in my way and we

19   were at an impasse.  He just blocked my way and wouldn't allow

20   me to retreat," facts there in that statement are that I was

21   going that way, he stood in my way, he blocked my way.

22       Wouldn't allow me to retreat, I think is fair to say, is

23   Mr. Phillips' perception of what was going on here as he

24   walked up and Mr. Sandmann did not step aside.  Mr. Phillips'

25   perception is he's not allowing me to go in the direction I

1    want to go.

2        Literally, factually, he's perfectly free to walk away

3    because he did eventually.  So to the extent that there's any

4    idea in here that, oh, I, Mr. Phillips, am prevented from

5    doing what I want to do, which is to walk straight ahead,

6    that's his perception of a series of facts which are set forth

7    which are correct.  That part, his perception is fair to

8    characterize as an opinion because the basic facts are

9    correctly stated.

10       The key point here on this sentence is whether or not it

11    can fairly be understood to accuse Mr. Sandmann of assaulting

12    Mr. Phillips.  That's what would make it defamatory.  Anything

13    short of that, simply standing still, blocking someone, even

14    blocking him in a way that doesn't allow the gentleman to move

15    forward, even that's not disgraceful to a level of it's being

16    defamatory.

17       What would make it defamatory is that it rises to the

18    level of an assault.  So that's the key question here.  Can it

19    fairly be read to mean that, that the Post was trying to say

20    that.  I don't think that's a fair and reasonable

21    interpretation.

22       Now, counsel referred to these editor's notes, and I

23    think it's important to understand that they have misquoted

24    the Post's policy.  They have said in their brief and counsel

25    said it again today that an editor's note is, in the words of

1    the policy, a correction that calls into question the entire

2    substance of an article.  That is not what the Post policy

3    says.

4         They put an ellipsis in their quote that totally changed

5    the meaning.  It doesn't say that an editor's note is defined

6    as a correction that calls into question the entire substance

7    of an article.  It says, "When a correction is published that

8    calls into question the entire substance of an article, you

9    should also include an editor's note that explains why you're

10   correcting it."  They've totally distorted the concept of an

11   editor's note that's set forth in the policy.

12        And they have another misquote.  They quote the policy as

13   saying it's necessary to use the editor's note to inform

14   readers whenever we correct a significant statement.  That's

15   not what it says.  Again, they use an ellipsis.  They leave

16   out the words "correction or clarification."

17        So illustrating the difficulty sometimes of accurately

18   putting into words what someone else has said or conveyed.

19        Let's talk about the editor's notes, because I think

20   they've been mischaracterized.  And Your Honor can read them.

21   But the Post exercised, I would say, great journalist

22   responsibility by flyspecking those articles and publishing an

23   editor's note that said that certain things that Mr. Phillips

24   had said and certain things that others have said have not

25   been corroborated or even been contradicted by fuller video

1    evidence and by further reporting.

2        Getting to my point, what the Post did here was bring to

3    bear traditional reporting techniques to a story that had been

4    viral on social media.  And when they did that, they decided,

5    you know what, our first story said, for example, that the

6    students taunted Native Americans in the lead-up to the

7    encounter.  Well, if you look at it carefully, the taunting of

8    the Native Americans didn't occur in the lead-up.  It occurred

9    after the Israelites had already started a confrontation.

10       So, actually, what was not reported by further reporting

11   was "in the lead-up to the encounter."  That's the part of

12   that sentence that was not corroborated by further reporting.

13       The Post had said, as I said before, an image appeared to

14   show that Mr. Sandmann was physically intimidating

15   Mr. Phillips.  The editor's note said, well, further video

16   evidence doesn't indicate that he was physically intimidating

17   Mr. Sandmann.

18       So what was published initially was an opinion of a

19   columnist based upon some video.  And the Post went and got

20   more video and said, you know what, we don't think that

21   opinion is sound so we're going to put an editor's note and

22   say we don't think it's sound.  That doesn't admit a false

23   statement of fact.

24       Another editor's note said that they hadn't corroborated

25   or confirmed Mr. Phillips' account that he was, quote,

1    "prevented from moving."  That's what I've been saying here

2    today.  He was not physically, literally, prevented from

3    moving.  He had all the liberty to move to the side and step

4    on, as the article says.

5         But the Post was careful to say, gee, if anybody took

6    that one sentence out of context, we want to make sure there's

7    no lasting misimpression so we're going to publish an editor's

8    note to be clear that he wasn't literally prevented from

9    moving.

10        And finally, we have an editor's note that said that it

11   wasn't corroborated that students or March for Life

12   participants had chanted "Build that wall."  It has nothing to

13   do with Mr. Sandmann.  The Post never said that he chanted

14   "Build that wall," but they scoured it.  The video evidence

15   said, you know what, although Mr. Phillips says he heard that,

16   video evidence doesn't contain any evidence of any student

17   saying "Build that wall," so we're going to say it.

18        That's not a retraction of any false and defamatory

19   statement about Mr. Sandmann.

20        Two other things, Your Honor, that I haven't had a chance

21   to say.

22        If there's one thing that I would think was really

23   harmful to the plaintiff and the other students, it was the

24   official released statement by the Diocese and the school, the

25   institutions that organized this trip, that presumably had the

52

1   ability to speak to the chaperones to confirm what happened.

2       The Diocese and the school issue a statement condemning

3   these students' behavior, and the Post reports that.  That is

4   one of the critical statements challenged that's false and

5   defamatory in this lawsuit.  How could the Post be libel for

6   publishing the definitive judgment of the Diocese and the

7   school --

8           THE COURT:  Well, to be clear about it, I believe

9   that statement says we're going to investigate.

10          MR. BAINE:  Right.

11          THE COURT:  Well, so these charges have been made,

12  and if true, they're very serious, so we're going to

13  investigate.  And they did investigate it.  As I recall, they

14  set out, they interviewed people, and they ultimately decided

15  that Mr. Sandmann had done nothing wrong.  He just stood

16  there.

17          MR. BAINE:  Right.

18          THE COURT:  He didn't block anybody.

19          MR. BAINE:  Which the Post reported on page 1.

20      My point is simply that when the Post initially published

21  the Diocese's initial statement, yes, it was not a final

22  judgment, but it was a very harsh statement that the boys'

23  behavior was inconsistent with the teachings of the church.

24      I want to make one point here.  We can't possibly be held

25  libel from repeating that assessment of church officials.  In

1  fact, the Supreme Court of the United States and the Sixth

2  Circuit has said you can't second-guess church officials'

3  judgments about what does and does not violate church

4  teachings without violating the First Amendment yourself.

5      So this Court could not possibly and a jury could not

6  possibly decide that it was false for the bishop to say that

7  the students' behavior was contrary to church teachings.  You

8  certainly couldn't say that the Post published a false

9  statement by saying that.

10      THE COURT:  Do you recall what exhibit that is, the

11  Diocesan statement?

12      MR. BAINE:  Yes, Your Honor.  It's an exhibit to our

13  reply brief, and it would be Exhibit 2 to the reply brief of

14  the Washington Post, Your Honor.

15      THE COURT:  I have a number of books here.  Let me

16  find that.

17      MR. BAINE:  That's not going to be in that white

18  binder, I don't think.  It's attached to our reply brief.

19      I take it back.  It's attached to the motion.

20      THE COURT:  I've got a headline here with a picture

21  of Mr. Sandmann and Mr. Phillips that said "Opposed to the

22  Dignity of the Human Person: Kentucky Catholic diocese

23  condemns teens who taunted vets at March for Life."

24      I gather this appeared in the motion of the Post.

25      MR. BAINE:  That's right, Your Honor.  And what I was

1    referring to as Exhibit 2 is this statement, which is the

2    public statement from the Diocese and bishop, obviously issued

3    for public release.

4              THE COURT:  A press release, yes.

5              MR. BAINE:  Finally, Your Honor, counsel again said

6    that the Post was somehow using this incident and the

7    plaintiff as some kind of a tool in the Post's anti-Trump

8    campaign.  And I really don't think that that's fair because,

9    as I said at the beginning, the Post bent over backwards

10   throughout its reporting to make sure that Mr. Sandmann's view

11   was fairly presented.  And it put the stories presenting his

12   version and presenting the final judgment of the investigation

13   on the front page of the story of the Post, as the earlier

14   stories which were in the Metro section.  So it gave greater

15   prominence to the stories that were favorable.

16        And I think that far from using this incident as some

17   part of an agenda, political agenda, what the Post did, as I

18   said, was bring to bear traditional reporting.  And in doing

19   so, it brought clarity to a situation that might otherwise

20   have been viewed solely through the lens of social media.

21        And when Megan McArdle, through the Post, says, quote,

22   none of this happened, she's talking about the comments of

23   people on social media.  So it was not directed specifically

24   at any Washington Post statement or Washington Post article.

25        So I do think it's fair to say that what the Post did

1    here was to take this story out of social media extremism and

2    put it in a legitimate, fact-based reporting context, to the

3    point that ultimately Mr. Sandmann's, as the bishop said,

4    exoneration was published on the front page of a national

5    newspaper, unlike the initial story.

6        And it is unfortunate, perhaps, that stories don't

7    develop all in 24 hours.  But bear in mind that when the Post

8    first did its story, although it didn't know who Mr. Sandmann

9    was, the story was viral already.  It was all over the place.

10   People were talking about it.  So the Post decided to try to

11   examine things itself and to try to talk to participants, try

12   to talk to -- find out who the person was and talk to

13   chaperones, to call the diocese, to call the school, and to

14   continue pursuing the story and not to leave it on day one

15   where the extremists on social media are controlling the

16   discourse, but rather to make sure that the story is covered

17   responsibly to the end, which it did.

18       Thank you very much.

19           MR. McMURTRY:  Your Honor, can I have just three or

20   four minutes to respond?

21           THE COURT:  Yes, go ahead.

22           MR. McMURTRY:  Thank you.

23           THE COURT:  I hoped it would get clearer, but it

24   seems to be getting more complicated.

25           MR. McMURTRY:  I apologize.

1    A couple of quick comments, Your Honor.  We'll just start

2    with the diocese.  In the initial article, the Post published

3    three versions of the initial article.  One came out

4    electronically, and then it was revised, and then it came out

5    in their Sunday paper.

6    But in the revised version, they cite to the Covington

7    Catholic -- or excuse me, to the Diocese statement.  And the

8    portion of the statement that they cite is, "We condemn the

9    actions of the Covington Catholic High School students toward

10    Nathan Phillips specifically and to Native Americans in

11    general," the statement said.  "The matter is being

12    investigated, and we will take appropriate action, up to and

13    including expulsion."

14    So the nature of that statement is defamatory because it

15    says we condemn the actions of the Covington Catholic

16    students.  And it raises the issue of kind of of and

17    concerning; are these things of and concerning Nicholas

18    Sandmann.  Certainly they are because he's the face of the

19    article.  And, you know, the swarming, the taunting, all of

20    these things, through the cases that we cited in our brief,

21    primarily the *Stanton* case, would allow the average lay reader

22    to conclude that the entirety of the reporting is of and

23    concerning Nicholas Sandmann, as is the Diocesan statement.

24    So what the Washington Post did is they republished this

25    Diocesan statement without any investigation, and we contend

1    that that was a negligent republication.

2         Also, on the issue of the blocking and whether or not

3    that was defamatory or not, Mr. Baine's description to you of

4    what occurred is not something that the average reader could

5    have taken from the initial article and the attached video

6    because the attached video doesn't provide enough detail to

7    know that Mr. Phillips could have gone this way, that way,

8    retreated.  That's only exposed in the longer video.

9         So the initial reporting by the Post, the way it was

10   stated, a reasonable lay reader could have easily concluded,

11   by the angles and what happened, that Sandmann had ahold of

12   Phillips by the arm or by his jacket and could have assaulted

13   him.  It's just not visible in the videos that are shown.  So

14   we think that only the full video shows what Mr. Baine

15   described.

16        And then, you know, finally, so many of these things are

17   issues of fact that we think requires more discovery and

18   ultimately a review by a jury as to what these things mean;

19   and we just ask the Court, suggest to the Court, that now is

20   not the time to allow a case that has had this much impact and

21   of this significance to be dismissed at this early stage.

22        With that, I thank you, Your Honor.

23             THE COURT:  Well, let me get to this one.  When the

24   Diocese says, this is terrible but we're going to investigate,

25   doesn't that indicate they don't know whether it's true or

1    not?  I read it as they saying it's terrible if it's true, but

2    we're going to investigate it.  And they investigated it and

3    determined it never happened.

4         MR. McMURTRY:  Yes.  Here's how I take this

5    statement.  Since it's somewhat ambiguous and can be

6    determined either to be defamatory per se or an innocent

7    statement, I think it's just as easy to read the article to

8    say that the Diocese of Covington has evaluated what happened

9    and they condemn those actions toward the students and Nathan

10   Phillips.  And then they say the matter is being investigated.

11        In the same sentence, "The matter is being investigated

12   and we'll take appropriate action, up to and including

13   expulsion."

14        And when you read that, it leaves the reader with the

15   idea that the Diocese knows how horrible these things were and

16   that they occurred and we're going to investigate and consider

17   discipline.  So it's the investigation is a part of the

18   discipline, as opposed to whether it's true or false.

19        THE COURT:  I think someone behind you is ready to

20   leap from his seat.  Then we're going to wrap it up.

21        MR. McMURTRY:  Okay.  I'll offer some clarification

22   that what Mr. Baine says is that the video revealed that there

23   was an opportunity to retreat.  We contend that that is not,

24   in fact, what the video necessarily showed in that

25   circumstance and that you could conclude from the video that,

1    in fact, he was blocked and prevented from retreating by

2    Sandmann and, therefore, that that would be imputation of a

3    crime.

4         Also, with regard to the Diocesan statement, you know,

5    they apologized to Nathan Phillips, which implies in that

6    statement that they believed that a wrong was committed.

7         So those are the clarifications I wanted to make.

8              THE COURT:  Okay.

9              MR. McMURTRY:  Thank you, Your Honor.

10             THE COURT:  Well, those of you who came in here

11   thinking this was a simple case will leave with that

12   impression corrected.

13        The Court will do the best it can with it.  Obviously,

14   there has to be some decision on this.  I hope to get out an

15   opinion within three or four weeks.  We'll be in recess.

16        (Proceedings concluded at 2:20 p.m.)

17                 C E R T I F I C A T E

18             I, JOAN LAMPKE AVERDICK, RDR, CRR, certify that
     the foregoing is a correct transcript from the record of
19   proceedings in the above-entitled case.

20   _\s\ Joan Lampke Averdick____        ___ July 11, 2019 ___
     JOAN LAMPKE AVERDICK, RDR, CRR       Date of Certification
21   Official Court Reporter

22

23

24

25